We'll hear from you whenever you're ready. Thank you, Your Honor, and may it please the Court. Mark Averacci here on behalf of Petitioner Extra Energy, Incorporated. Mr. Culverson has five years of underground coal mine employment. He also has a number of years of surface coal mine employment, some with Summit Services and some with Extra Energy. The question that this brings up is whether Mr. Culverson has enough coal mine employment in this federal black loan claim to invoke the 15-year presumption. Specifically, does he have at least 10 years of his above-ground employment that is considered, quote, substantially similar to the conditions in an underground mine within the meaning of 30 United States Code section 921 subsection c. 4. The Benefits Review Board found that Mr. Culverson did. This finding of substantial similarity is wrong as a matter of law. It relies on invalid deference to a regulation promulgated by the Department of Labor. Well, how do we handle the regulation? The regulation says regularly exposed. That substantially similar means regularly exposed to coal dust. Yes, that's a very good question, Your Honor. So the problem with the regulation. Well, I know what's the problem with the regulation. The regulation appears to be broader than the statute. But you didn't say anything to the ALJ, nor did you say anything to the Board. Very good question. I'll address that, and then I'll come back to the problem with the regulation. This argument as to the definition of substantial similarity and the deference to the regulation wasn't a reasonable, viable argument until the U.S. Supreme Court decided Loper Bright Enterprises v. Raimondo. That was June 28, 2024. All the litigation in this claim took place before that. This court, in 2015, had upheld a portion of that regulation, but only as it related to applying rebuttal limitations to employers. So had I made the argument, Your Honor, to the ALJ and to the Benefits Board? It could have been made, and we've indicated it could have been made. We get this type of situation all the time. If you think the regulation is too broad, you can challenge the regulation. But we also have additional conclusions. In this case, we have factual conclusions of extensive coal dust around this worker while he is working above ground, and both in this job and in his prior job at Summit. The argument, because this court in West Virginia, CWP Fund v. Bender, had upheld this regulation on a separate point. However, at that point, it wouldn't have been meritorious or viable or reasonable to argue that the ALJ and the Benefits Review Board should not defer to the regulation because the entire issue of deference has been set aside. The entire issue of Chevron has been set aside. That's what made this argument viable. And regardless... Chevron lets you challenge regulations. It didn't avoid it. It just required deference in certain types of circumstances. But ultimately, people challenged the regulations under Chevron. But you still could... If you were upset about the way they presented evidence and it didn't fit substantially, as you're pointing here, similar, which is the statutory language, you didn't make that argument below. There's not even a hint of it. Again, I'll reiterate, it wasn't viable, it wasn't reasonable. There are exceptions to whether this court might consider there to be a waiver or a forfeiture. One of those is whether it was reasonable at the time to make the argument. I think the argument as to deferring to the regulation, I think the argument as to whether to follow that regulation was foreclosed and was not reasonable based on this court's decision in Bender. It was in June 2024 when the U.S. Supreme Court directed that this court and all courts conduct an independent analysis and determination of the statute without deference to the regulation that this became an issue. Well, I guess the other problem you have is the question of waiver because you don't discuss the forfeiture obligation in your brief. You don't, you don't, you just kind of go straight into Loeb or Bright and there's no, there's some discussion, but there's no discussion, this discussion that we're having now as to whether or not there's an exception or if the issue was forfeited. The issue of forfeiture is briefed in the reply brief, Your Honor, and there's a three-piece framework under Ed Potter and that's fully addressed. But the question is, as to forfeiture, ultimately, was it unreasonable to have not raised this issue before? And my position is until the U.S. Supreme Court invalidated Chevron and directed this court to make an independent assessment of substantial similarity. Is it correct that they invalidated Chevron totally? I mean, the court, if you look at Loeb or Bright, the language is that the court must exercise this independent judgment. Then there's an exception to it. But that is when a particular statute delegates authority to the agency. This statute delegates authority, does it not? Doesn't it delegate authority directly to the Secretary of Labor to set certain standards? So even if you, under your contention, Loeb or Bright has this effect, it didn't completely wipe out what an agency, that agency is just there in some perfunctory capacity, when Congress specifically gives this delegation of authority. Is that not an exception? That is a factor to consider. No, it's right there in the court. It says, but there's an exception when a particular statute delegates authority to an agent consistent with the constitutional limit. That's the question, consistent with the constitutional limits. And the Skidmore deference, it's not deference. The agency can have a power to persuade, but it's only to the extent— What limits the Congress from giving the Secretary of Labor delegating authority to set up standards for an act that it creates? The statute— When you think about it, there is still a place for an agency in this country. Loeb or Bright didn't come and say, well, anything the agency says, courts can just ignore it and do whatever they want to do. I mean, you think about agencies like the Nuclear Regulatory Commission. We have independent authority. I mean, don't you think there is something in there that says, you know, if that agency determines it, we ought to have some deference to what they're doing? Specific type things like that is one thing to do factual, but something that requires some type of expertise. In this instance, the Secretary of Labor is giving this explicit delegation to set standards. I disagree with the explicit delegation of authority as to substantial similarity. The statute here, subsection C-4, 921, subsection C-4, the regulation has to mirror this language because the language is specific. And it says, quote, the conditions of a miner's employment in a coal mine other than an underground mine were substantially similar to conditions in an underground mine. The finding that should be made below and what the regulation should direct is the language of this statute. Congress said the conditions need to be substantially similar. The regulation goes beyond that and says, well, we're just going to throw out substantially similar. We're not going to consider other factors. We're going to ask one question. Congress, I mean, when you look at the statute, as I say, expressly delegates to the Department of Labor the authority to give meaning to what constitutes disabled due to black lung disease. And when you approach it from that perspective, you want every time a case come up here that we as judges are going to be doing this? You think that Congress or that even the Supreme Court ever intended that we judges would be in a position to become experts to the level that the Department of Labor and those who do this on a daily basis? Your Honor, I want this court and all other courts to be experts in statutory interpretation. That is what Loper Bright instructed. Loper Bright says that this court must independently interpret 30 United States Code Section 921C4. Not to delve into the details of what, you know, pulmonary function testing, those standards. That might be appropriate to look to the director to determine, well, what does the director say? Even if Congress says, regarding to that statute, that in a particular statute that delegates the authority itself explicitly, we still have to do what you say. It's not what I say, Your Honor. It's what Loper Bright Enterprises requires. And this statute— I just read the language. That language that I read came straight from Loper Bright. That's not something I made up. So does the language that this court must determine what is the best interpretation of that statute. Agreed. If it does not involve a particular delegation by Congress to the agency. Agreed. I would not agree to that other part. It's this court fundamentally— You're not agreeing to Loper Bright. I'm just saying I'm reading what the court said here. If I might call upon the Tenth Circuit, I mean, the Tenth Circuit has addressed this squarely. They found that the directors, the Department of Labor, their interpretation of statute is not entitled to deference under Loper Bright. And that case is cited by me in the briefing. But that's the issue. There's no deference due to that regulation. This court can and should ask the Department of Labor what it thinks. And, you know, the Department of Labor has previously indicated that the standard I advocate for today, the one adopted by Midland Coal, is the appropriate standard because it allows the ALJ— So how different is it from the registration that was put forth by the agency here? Doesn't it also focus on the dustiness, on the overground? Isn't it basically the same thing you argue that the standard should be? Isn't that the regulation? I wish it were, Your Honor, because in this case, the ALJ asks a single question, was there regular dust exposure? And in asking that question, the ALJ— But if we look at the legislative intent, that was what Congress was concerned with, the dust conditions. Certainly they're concerned with that, but they're also concerned with objective criteria, other factors that might be relevant to the circumstances. I mean, I know that's your argument, but it seems as if Congress is less restrictive and that their legislative intent was to the benefit of the coal miner if there is any, based on the conditions of dust. I mean, and so I think your arguments are making it more restrictive as to what Congress's legislative intent. But if we look at the legislative history here, it doesn't—what you're saying expands way beyond what Congress has said. No, Congress has said the conditions, conditions have to be substantially similar. Conditions more than just was there regular dust exposure. And the problem— You may have a really good argument on that. My suggestion is that substantially similar would be different from regularly exposed, because regularly exposed, you could be regularly exposed to only one quarter of the amount of dust, and it would satisfy the regulation, whereas one quarter would not be substantially similar. But my biggest problem is that you are presenting this to us for the first time, and there were factual findings that probably raise this to the level of substantially similar if that had been raised. And, you know, we have our decision in Potter where we didn't suggest that—I don't think there's any suggestion of futility, but that was a more recent decision about whether you have to exhaust. And I think it would have been futile to make this argument. The administrative law judge at the Benefits Review Board, they would have all— You may have had the deck stacked against you, but you still could have made it if you believed in it. It did—the argument did not exist before Loeb or Bright. Sure it did. But— There's two statutes. You can read the two, and regularly exposed, it doesn't—there's no quantity attached to that. So the regulation says you could be regularly exposed to one-eighth the dust, whereas the statute said it has to be similar to coal mine dust—surface has to be similar to the underground mining. But the factual presentation in this case hurts you, too, because there were real findings that he was exposed to a lot of dust while surface mining, not only at your company but at his prior employment. And there's no evidence about his prior employment except his evidence, which was that he was exposed to this dust. He had to clean it up every day. It was lying around on the seat inside his cabin—cab. And they made factual findings on that. What troubles me the most is that we're now—we have no input from the board or the ALJ on this issue. But we had continually challenged whether his coal mine employment is considered qualifying, whether it's substantially similar. So I want to make a distinction. The issue that Labor brought to the forefront was this legal issue that this Court can address. There's a problem—I get it, Your Honor. You're referring to factual findings. The problem is the ALJ made such findings without considering probative, relevant evidence, dust-sampling evidence that we put into the record. Well, the board addressed that, didn't it? The board said it was harmless error, Your Honor, to not consider it. Because you didn't address the employment at Summit where there were 10 years of employment. But Mr. Culberson had testified that his employment conditions were the same at Summit as they were at Extra Energy. We have relevant and probative dust-sampling evidence showing the dust levels were one-fourth of the applicable permissible exposure levels. So they were way below what is even—what's considered the standard. But I don't even—see, this is what I'm saying. You are—this seems to be the test, since we're considering conditions. You don't have to go consider the conditions here or there, and that's kind of what this seems like to be your arguments. The conditions at Extra Energy during the time that he was working, he testified to that. That's in the facts. You're saying, oh, well, the ALJ didn't consider this over here or the conditions over here in these conditions. And he testified to the conditions. Except the ALJ ignored critical, relevant evidence that could have altered the outcome. That's prejudicial error. And that's the problem. The focus on, is there just regular dust exposure? If Mr. Culberson testifies he says yes, that's the end of it. And the standard I'm advocating has been in existence in the Seventh Circuit since 1988. It was previously the one that the director indicated was the reasonable approach. It's not onerous. It's straightforward, and it's the DOWCV Midland Coal Test. Under this prior standard, the coal miner has to offer sufficient evidence of the surface mining conditions in which he or she worked, and then it's the function of the administrative law judge based on his or her expertise. And we would expect certain objective factors to compare surface mining conditions established by the evidence to those that prevail in underground coal mines and then make a factual finding of substantial similarity. That is a straightforward application. As I said, Your Honor, it's been in existence since 1988. The director indicates in promulgating this new regulation, which is, in effect, narrow and invalid, that it's important that ALJ's administrative law judges make specific factual findings as to substantial similarity. ALJ didn't do that here. It just says, well, there's regular coal dust exposure. We identify dust sampling records that are objective evidence. We identify an article. What standard did the ALJ use with respect to the dust? There was a lot of evidence about the coal mine dust. What did the ALJ say with respect to that? Just regular dust exposure. It meets the definition, or not the definition, but the concept of regular dust exposure, therefore, substantial similarity. That's the analysis that the ALJ went into. The ALJ didn't consider that Mr. Culberson works in enclosed cabs, air conditioning, windows up. Well, they had explanations for that. I mean, the air conditioning wasn't working a lot of the time. He left the windows open. The seals were not good. That's a nonstarter in terms of factual aspects. You may have a good case for a fact finder, but the facts were found against you on that issue. Without considering probative, reliable, credible evidence, and also while disregarding Mr. Culberson's expert who agreed, testified, under oath, that, yeah, Mr. Culberson likely had lesser exposure than would have been underground. That is not considered by this ALJ. Because the ALJ asks, is there regular exposure, the answer, the conclusion comes up yes, and that's the end. I'll see if my time is up. We'll get you on rebuttal. Thank you. All right. Ms. Petzonk. Thank you, Your Honors. My name is Sam Petzonk. I'm counsel for the respondent, Mr. Culberson, Thomas Culberson. This is a pretty, I represented him in the underlying black lung application at the Department of Labor. It's a pretty standard federal black lung record. The ALJ made reasonable findings supporting it. Well, it's a standard record, but it's got a peculiar issue here. And the underlying point that the regulation applies the statute, the statute requires a notion of similarity, and the regulation would authorize exposure to one-fourth the amount it does because it's regular. And there's no quantity aspect to that. I understand. So that's a problem. But I think there's several matters that you can say and do say in response to that issue, and I'm curious on two questions, why it's not forfeited, that issue, and I'm also curious as to know why the ALJ left out their testing data. I generally join the solicitor's arguments on those issues. I can address the second one. As to forfeiture, I would like to let the solicitor address that. I tend to agree with you. It wasn't raised. It could have been raised. They could have raised Chevron deference in a Chevron argument below. They have also made assertions of error regarding the medical findings, and I took my position here today to be, if you had questions about the medical evidence, certainly there was plenty of substantial evidence to support the findings of impairment and causation of impairment. Those are some of the other assertions of error that were not addressed in the opening. But I can go to your question about the minor's testimony and the record regarding those dust samples. The minor testified, as you noted, Judge Anemar. I do, but I want to know why the ALJ left out the employer's data. They had actual measurements, error measurements. Now, they may have not been good data or whatever, but what was the reason they were excluded? Well, I don't know that the ALJ excluded them, but an underground coal miner doesn't have to show that the mine violated the dust limit in order to demonstrate dust exposure underground. This is my question. The employer came in and tried to make a case that the surface mine exposure was not similar to underground exposure by showing data measurements taken of the air outside and compared to measurements of the air inside. I think the ALJ ignored those to the extent the ALJ didn't discuss or weigh them. They wouldn't be relevant to that assessment in an underground mine either, Your Honor, simply because the mine doesn't violate the dust limit doesn't mean that there's no dust exposure. You can develop black lung even if you work at a mine that isn't violating the dust limit. Under the regulation, you could have regular exposure to one-quarter or one-eighth of the dust that's in the underground, in which case it would not satisfy the statutory requirement of being substantially similar. Well, that's where the dust sampling doesn't get you there is what I'm saying. It's not relevant. The fact there was no violation, there could be no violation underground too. It doesn't affect whether or not you had regular dust exposure. The probative testimony, the relevant testimony was the conditions that he worked in, which Mr. Culbertson addressed. You see what I'm saying? If the judge had looked at dust samples from an underground mine, they very well might have showed no violations as well. It doesn't affect whether there was actual dust exposure in the day-to-day work. Just because you work in an area where there are no dust samples that violate the limit doesn't mean you were not regularly exposed to dust. Those samples don't prove any point. Is that what the ALJ said? I don't know that the ALJ analyzed it that way. Well, that's what I was asking you about. That's why it's not really probative or relevant, though, and shouldn't prejudice the results. I think that's what the board said as well. The board based it on the fact that he had 10 years of exposure in which there were no data, and it was harmless. And it was harmless that the ALJ didn't get into this kind of consideration, but really the evidence doesn't prove, the dust samples don't prove that he had no dust exposure, what he testified about how he encountered dust. And it's important also that in the record there was evidence that he had developed emphysema and COPD from his dust exposure. It gets to your question, Judge Niemeyer. The agency didn't even have a separate enforceable dust limit for silica dust at that time. When silica dust causes emphysema, the dust results here aren't relevant at all to whether he was exposed to silica dust, which is causative of the medical condition that he suffered from. So the fact that the mine didn't have coal dust violations doesn't even begin to address the question as to whether this miner was or wasn't exposed to the silica dust, which causes the pulmonary emphysema. That was the basis of his disability. So, again, it was harmless that the ALJ didn't get into the coal dust samples because the type of exposure the miner testified he had and the type of disease that he actually developed was consistent with another type of dust exposure, silica dust exposure, which is not addressed at all in the dust samples. Those dust samples are coal dust samples, not silica dust samples, so they don't get to the issue of whether he was exposed to the risk factors for emphysema, which he has. And so for those reasons, the ALJ didn't prejudice anybody by not exploring the coal dust samples. And I would also just emphasize that what is definitely not in contention here is that this miner has severe pulmonary impairment. All of the pulmonary function testing, even that was done by the coal company's doctor, showed that he had about 40 percent of his predicted lung function. So he's got serious impairment. He worked in the mines for 30 years. The only question is, did he have sufficient dust exposure to place him at risk for developing emphysema? And this is relevant because the silica dust is a significant risk factor for the emphysema. The coal dust samples don't go at all to the exposure to silica dust. He testified. I worked outside. I worked in an operation where you're grinding sandstone and coal. Those are multiple dust exposures. He could very well have developed the emphysema from the sandstone dust exposure in the conditions he described in that cab and working in the pit of the mine was very dusty. And so there was plenty of sufficient evidence based on his testimony, based on the type of emphysema, the type of pulmonary impairment that he had. His testimony fully supports a medical exposure predicate for that diagnosis. So there's no error from that standpoint. And if I cede the rest of my time to the solicitor, thank you. Thank you. All right. Mr. Doyle. May it please the Court, I'm Michael Doyle. I'm here on behalf of the director of WCP. Your Honors, I'd like to address the forfeiture issue first. In this Court's decision in Ed Potter Cole, the Court made clear that the intervening change in law exception to forfeiture is a very narrow exception. It only applies when there's a direct precedent on point that makes an argument futile to be raised. And that wasn't the case here. Mr. Grugarachi says, well, this Court's decision in Bender from 2015 foreclosed his ability to argue before the ALJ and the Board that this regulation is invalid. But Bender clearly dealt with a different subsection of the regulation, which is at 718.305. Bender dealt with the rule-out standard, which is in subsection D. And here we're talking about the 15-year presumption, 305B2. So it's a completely different issue. Bender said nothing at all about how the presumption is supposed to work. In fact, Bender, the minor, was an underground miner. So he had the benefit of the 15 years without regard to a substantial similarity. The term substantial similarity can't be found in Bender. So Bender is not a precedent from this Court that would have foreclosed extra energy from raising that issue before the ALJ and the Benefits Review Board. With respect to Loeb or Bright overruling Chevron deference, the notion that that would be an intervening change in the law is misguided because both Chevron and Loeb or Bright are about interpretive methodology. They don't tell courts how to address certain issues except as to here's how we approach. If there are certain conditions met, Chevron held, well, the courts would give controlling deference to the agency's interpretation. But that doesn't mean that, for example, that you can look at this statute and this regulation at Chevron and say, okay, the court has foreclosed from reaching any other conclusion but that the statute is that the regulation is valid, right? It's just about how a court is supposed to go about its task of statutory interpretation. That changed with Loeb or Bright. But certainly nothing about Chevron foreclosed the argument that extra energy raises on appeal. I'll also note the irony, finally, that one of the arguments that extra energy makes is about Dr. Rosenberg's FEV1-FEC ratio. He raised that in the proceedings below, right? That issue had been foreclosed by, I think in footnote 11 of my brief, I cite 11 or 12 different court of appeals cases directly dealing with that issue, saying that Dr. Rosenberg's theory conflicts with the Department of Labor's approach, and yet they keep raising the same issue. So when we talk about futility, I think it's somewhat ironic they were able to raise that issue before ALJ and the board, even though there's this mountain of court of appeals authority against them, but they couldn't raise this issue about the validity of the regulation. Now, with respect to the regulation itself, whether it is valid, we did detail the various things you look at. Under Loeb or Bright, you're now thinking about is this the best reading of the statute, right? Is regular exposure a legitimate proxy for substantial matter? Well, you heard my difficulty. Regular exposure includes exposure to only, say, one-fourth or one-eighth of the dust in the underground mine. And you're regularly exposed to one-eighth, and it would be hard for me to conclude that exposed to one-eighth on surface mines to what's exposed, the exposure in an underground mine, would be substantially similar. Yes, Your Honor. It's not similar at all. It's dissimilar almost, but I would, if we had just had that regulation before us and it was preserved and everybody's fighting on it, I think that that would be a tough case to address and a tough case for you to defend. I don't think it's difficult to defend, Your Honor, and I think the reason for that is when you take into account the reasons for this presumption, the presumption is designed to make it easier for coal miners to make the case. Oh, I understand all that, and it governs the presumption, but the question is, regardless of all the latitude, regularly exposed could be regularly exposed to roughly anything, whereas the statute requires there to be substantially similar conditions. And if you're regularly exposed to much lighter conditions, I don't think you could call that similar. Well, then that invites the question of what's the comparator on the side of the underground coal mine, because you just said, oh, it's .4, .8 or whatever, but the coal mines throughout the United States, underground coal mines, they have varying levels of dust levels. Oh, yeah, I understand that. As a factual matter, they can be, but I'm assuming that we know the facts, that there are 100 units of coal dust underground and that there's only 12 units of coal dust on the surface mine. Now, it seems to me the surface mine work would not be, the conditions would not be similar to the underground in that hypothetical. The problem with that hypothetical, there are several problems. One is the difficulty of proof. Oh, I understand. Hypothetical supposes the fact.  Supposes the fact. In this case, there was a lot of proof, particular to this particular case, and the ALJ made findings and the board addressed them and so forth, but I'm just talking about the focusing on the regulation itself. I think there's some serious questions that might be worth the director looking at. You were about to give the problems with it, and your partner there gave some indication, because when you say substantially similar, we don't know what the similarity is because you don't know what it is underground. I mean, if that's it, it's not a number comparison that a hundred is in. A hundred is something you just pull out of the air, but what were the points you were about to make in response to it? I'm really curious as to how you view this. The difficulty is, remember, it's the claimant's burden of proof. So you're asking a claimant to, number one, prove what the conditions are in underground mines, and then you're asking the claimant to prove. Let's say, okay, the evidence says at the mines in West Virginia, common exposure underground is 0.5 or 1 or whatever. So now it's the claimant's burden to say that my conditions that I was exposed to on the surface were similar to 0.5 or 1 or whatever when I was in the coal mines of Summit in 1996. How is he going to prove that? It would be impossible to prove that for a miner. But even there, would that also mean if you've got to look at this particular underground, that this is different, it's this standard, this here is different depending on the mine, in every instance you've got to go and try to figure out what that particular one was? I mean, that's the confusing part. Right, I think what is unanswered and what the Midland Coal Court was trying to address was, you know, which mine, what's the comparator? Isn't that a criticism of Congress's selection of that? In other words, the impossibility to measure. I gather what both you and Judge Wynn are exploring is that each underground mine is different conditions, and you have to have the data, actual data, from this underground mining in order to determine whether the surface mining is substantially similar. And that proof is almost impossible for a claimant. That's your point. That's my point. But Congress did use substantially similar. And so the question is, how do you interpret that? Now, the agency has concluded that, well, regularly exposed is enough. But the problem with regularly exposed is you may be exposed to a minuscule amount of dust. That is almost by common sense, not even close to what's in the underground mine, would still be covered. And I would think if you had a straight-on application of the reg, there might be some difficulties because it may be much broader than what Congress intended. Before we blame Congress here, though, Your Honor, I would suggest that Congress used a broad term, substantially similar to conditions in underground mines, knowing that that would be interpreted in a way that's consistent with the remedial purpose of the Black Line Benefits Act, consistent with the fact that what we're trying to do here. When there's interpretation, but we do have to follow the words, don't we? Right. But substantial similar is enough to play. Substantially similar is a term that says it's similar, give or take, plus or minus some level. And it seems the agency could certainly regulate that and increase that margin of similarity. But they still do use the word similar, which has a meaning. And the question in my mind is whether the regulation allows dissimilar conditions to suffice. And I think it would be helpful to modify the regulation generously. Similarity has to be generously, or you can presume something that the mines have a certain level or whatever. I don't know. But as it sits now, it looks like an interpretive question. And my biggest difficulty is whether the employer raised it and presented it. But I do think there is an issue there at some point, don't you? A legitimate issue. It sounds like there will be, depending on who the panel is. I'm speaking on behalf of the director. All I'll say is the preamble to the rulemaking does go through, you know, in a thoughtful way, what the department was trying to do here. You do have Judge Calfridge's concurring opinion, which we like in a post-Chevron world, that, you know, the agency did the best it could with the language in a way that- Do you agree that the statute does give the Secretary of Labor explicit authority to promulgate these regulations? Yes, Your Honor, although I don't. With respect to this regulation, you see in our brief we don't claim controlling deference in a post-Chevron world. We're not suggesting that this regulation is entitled to controlling deference. The reason for that is this is an interpretive rule that the department explicitly promulgated pursuant to- Well, you used the term controlling deference. I'm not sure what that means. It seems that local right basically said, you know, the courts have to interpret the statute, so I don't know what kind of deference we give controlling otherwise in general, but there is this provision in there that speaks to the fact that if Congress gives it somewhat explicit to do these particular things, and it has to because Judge Niemeyer alluded to, Congress needs to fix it, but Congress can only fix so much because Congress cannot be at every mine, cannot be on every case, and it is the Department of Labor that has some- the Secretary of Labor has some expertise, some knowledge, at least internally, what's going on there. And the question is, did it give, and maybe the type, I don't know if controlling matters, but it just says that this is different if Congress has given a secretary this authority. I agree with that. We did claim skid more deference in our brief, Your Honor, based upon the agency's expertise. Well, that authority would, of course, authorize the agency to fill all kinds of gaps, but I'm not sure that authority would ever authorize agency to do something in conflict with the statutory provision. I think that's correct, Your Honor. All right, thank you very much. All right, we'll hear from Extra Energy. Yes, thank you, Your Honor. On October 1st, 2025, this court published opinion. Hobart Mining Incorporated v. Director, Office of Workers' Compensation said, quote, our interpretation of the act and its regulations, however, involve questions of law. We do not defer to the board on legal issues. The question raised today about this regulation and how it conflicts directly with the statutory language is substantially similar, is an appropriate legal issue for this court to address right now. It would not have mattered what the board or the administrative law judge had said, because this court has agreed there is no such deference to be given to the board on its interpretation of the statute. So that's a purely legal question. And there was some discussion about, well, how is the miner going to prove this or that as it relates to underground coal mines? The standard I've advocated for, which is the one that the Department of Labor agreed was the valid one in 1988, requires only that the miner produce sufficient evidence of the surface mining conditions. And then all the other nuance and the facts and the factors to be considered, the parties could rely on the expertise of the ALJ and the parties could produce what evidence they believe is necessary. And in this case, the employer submitted relevant evidence that was disregarded and ignored by the administrative law judge. You know, the administrative law judge said that as to the dust sampling evidence, I find the document relevant to the question of coal mine dust exposure and therefore admissible. It is admitted into the record and will be weighed according to its relative probative value. You know what? That never happened. Do not excuse the clear prejudicial error of the ALJ failing to consider evidence the ALJ admitted was relevant and probative. It was a very simple, straightforward path in this case. You could vacate the finding of substantial similarity because the ALJ failed to consider relevant probative evidence that could have altered the outcome, send this back, have the ALJ reconsider that issue and the evidence, and then make appropriate factual findings. All right. Thank you very much. Thank you. All right. We'll come down to Greek Council and take a short recess. Are you okay with this short recess?  And take a short recess. This honorable court will take a brief recess. Thank you.
judges: Paul V. Niemeyer, James Andrew Wynn, DeAndrea Gist Benjamin